# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| LEVY FAMILY INVESTORS, LLC; LFP RIVER WEST INVESTORS, LLC, SERIES 35; MICHAEL WALLACH AS TRUSTEE OF THE MICHAEL WALLACH TRUST U/A/D 02/26/2012; SOPHIA STRATTON AND RICHARD NOVAK AS TRUSTEES OF THE STRATTON NOVAK JOINT REVOCABLE TRUST DATED DECEMBER 15, 2016,<br><br>               Plaintiffs,<br><br>      v.<br><br>OARS + ALPS LLC, SWATI (MIA) SAINI DUCHNOWSKI, LAURA LISOWSKI COX,<br><br>               Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **C.A. No. 2021-0129-JRS** |

## MEMORANDUM OPINION

Date Submitted:  November 2, 2021
Date Decided:  January 27, 2022

Rudolf Koch, Esquire and Matthew D. Perri, Esquire of Richards, Layton & Finger, P.A., Wilmington, Delaware and Greg Shinall, Esquire and Michael G. Dickler, Esquire of Sperling & Slater, P.C., Chicago, Illinois, Attorneys for Plaintiffs.

Robert S. Saunders, Esquire, Sarah R. Martin, Esquire and Michelle L. Davis, Esquire of Skadden, Arps, Slate, Meagher & Flom LLP, Wilmington, Delaware, Attorneys for Defendant Oars + Alps LLC.

Ryan D. Stottmann, Esquire and Miranda N. Gilbert, Esquire of Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware and Tamir Young, Esquire of Studin Young PC, Hauppauge, New York, Attorneys for Defendant Laura Lisowski Cox.

Peter B. Ladig, Esquire, Elizabeth A. Powers, Esquire and Sarah T. Andrade, Esquire of Bayard, P.A., Wilmington, Delaware, Attorneys for Defendant Swati (Mia) Saini Duchnowski.

**SLIGHTS, Vice Chancellor**

Plaintiffs, investors and former convertible noteholders of Defendant, Oars + Alps LLC ("Oars" or the "Company"), have brought claims of fraud and breach of contract against Oars and its founders following a transaction in which New Ventures PBL Holding LLC ("New Ventures"), an affiliate of S.C. Johnson & Son, Inc. ("SCJ"), acquired 73.746% of Oars' issued and outstanding membership interests (the "Transaction"). The claims are asserted in Plaintiff's Verified Complaint (the "Complaint").

When Oars' founders, also named as defendants, decided to sell the Company, they realized they needed Plaintiffs' approval to consummate the Transaction under the terms of Plaintiffs' convertible notes. That approval process was confounded when New Ventures demanded strict confidentiality with respect to the Transaction and would not allow Plaintiffs to review the Transaction documents. To fill the information void, Defendants made several representations to Plaintiffs regarding the terms of the Transaction documents in agreements between Oars and Plaintiffs cancelling the convertible notes. These representations were given as a condition to Plaintiffs providing their consent. After the Transaction closed, Plaintiffs discovered that the Company was sold for a higher price than was represented by Defendants, prompting Plaintiffs' claims for fraud and breach of contract in this action.

The Company has filed a motion for judgment on the pleadings as to all claims in the Complaint under Court of Chancery Rule 12(c). The remaining defendants

1

have moved to dismiss Counts One and Three of the Complaint under Court of Chancery Rule 12(b)(6) and have joined in the Company's motion for judgment on the pleadings.

For reasons explained below, I grant in part and deny in part the Company's motion for judgment on the pleadings and the remaining defendants' motion to dismiss. Specifically, Count One for fraud and Count Two for breach of contract survive dismissal, but Count Three for breach of contract does not.

## I. BACKGROUND

I draw the facts from the Complaint since the Court is obliged to accept all well-pled facts in the Complaint as true.[1]

Oars, a Delaware limited liability company, is "an early-stage skin-care company" that was founded by Swati (Mia) Saini Duchnowski and Laura Lisowski Cox (together, the "Founders").[2] Plaintiffs were early investors in Oars; they include Levy Family Investors, LLC ("LFI"), LFP River West Investors, LLC, Series 35, Michael Wallach as Trustee of the Michael Wallach Trust U/A/D 02/26/20212 and

---

[1] *See In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 167, 168 (Del. 2006) (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002)).

[2] Verified Compl. ("Compl.") (D.I. 1) ¶¶ 1, 21–23.

Sophia Stratton and Richard Novak as Trustees of the Stratton Novak Joint Revocable Trust dated December 15, 2016.[3]

Between 2017 and 2018, Plaintiffs collectively provided approximately $1,200,000 in financing to Oars in return for convertible notes (the "Convertible Notes").[4] Those Convertible Notes contained special rights, including the right to approve (or block) any sale of more than 5% of either of the two Founders' interests in the Company.[5]

In addition to its initial investment, LFI provided $500,000 to the Company in exchange for a promissory note ("Promissory Note").[6] According to LFI, the parties intended for the Promissory Note to be redrafted to provide LFI with substantially the same rights it was provided in the earlier-issued convertible notes.[7]

---

[3] Compl. ¶¶ 17–20.

[4] The Convertible Notes are attached to the Compl. as Exs. A–B.

[5] Compl. ¶ 4.

[6] Compl. ¶ 7, 24. The Promissory Note is attached to the Opening Br. in Supp. of Def. Swati (Mia) Saini Duchnowski and Laura Lisowski Cox's Partial Mot. to Dismiss Pls.' Verified Compl. ("Founders' OB") (D.I. 20) as Ex. B ("Promissory Note").

[7] Compl. ¶¶ 7, 24.

Relevant here, the Promissory Note contained both an anti-modification clause[8] and an integration clause.[9]

In March 2019, the Founders informed Plaintiffs they were considering the sale of a majority stake in Oars and began discussing the possible sale with New Ventures, an affiliate of SCJ.[10] The Founders then advised Plaintiffs that a confidentiality agreement with New Ventures prevented the Founders and the Company from providing Plaintiffs with access to the draft Membership Interest Purchase Agreement ("Purchase Agreement") that was in circulation with New Ventures. This dynamic presented a challenge for all concerned. The Transaction could not be consummated unless and until Plaintiffs agreed to waive

---

[8] Promissory Note § 9 ("This Note may be modified, amended, changed or terminated only by an agreement in writing signed by Payee (or its assignee) and Maker.").

[9] Promissory Note § 10 ("This Note sets forth the entire agreement and understanding of Payee and Maker . . . . Maker acknowledges that no oral or other agreements, understandings, representations or warranties exist with respect to this note or with respect to the obligations of Maker under this Note, except those specifically set forth in this Note.").

[10] Compl. ¶ 8. While this court has urged litigants to adopt uniform naming conventions in their briefs for clarity, the parties here, unfortunately, did not oblige. *See generally* Compl. (using "SCJ" to refer to the entity that acquired Oars membership units); Founders' Br. (same); Def. Oars + Alps LLC's Opening Br. in Supp. of its Mot. for J. on the Pleadings ("OAOB") (using "New Ventures," an abbreviated name of the affiliate entity, to refer to the acquirer). I will refer to the acquiring entity as "New Ventures" throughout this Memorandum Opinion.

their blocking rights; but Plaintiffs needed clarity regarding the terms of the Purchase Agreement before they would agree to waive those rights.[11]

As an alternative to supplying the Purchase Agreement to Plaintiffs, Defendants made representations to Plaintiffs concerning the terms of the Transaction in Note Cancellation Agreements ("NCAs").[12] As the name suggests, the NCAs cancelled the convertible notes to reflect a conversion of debt to equity. They also included representations that the Founders were receiving $5.0815 per membership interest—the same price at which Plaintiffs would sell their interests on an as-converted basis—and that "[e]xcept with respect to the purchase price for the Company membership interests Sellers are transferring at Closing, none of the Sellers will receive any other cash payments or other valuable inducements in connection with the Closing with respect to such membership interests."[13] In all, "Defendants told Plaintiffs, and provided documents showing, that [New Ventures] was paying a total of $8.85 million for 75% of the Company on a debt-free basis."[14]

---

[11] Compl. ¶¶ 8, 29, 32. The Membership Interest Purchase Agreement is attached to OAOB as Ex. 1 ("Purchase Agreement").

[12] The Note Cancellation Agreements are attached to the Compl. as Exs. C–D ("NCAs").

[13] Compl. ¶¶ 9, 35; NCAs § 4(c). The "Sellers," as defined, include the Founders and two non-party unitholders. NCAs § A.

[14] Compl. ¶ 9. This suggested an enterprise value of $11.8 million. Compl. ¶ 13.

5

With the Defendants' representations in hand, Plaintiffs waived their blocking rights and the Transaction closed soon after.[15]

About a year after the sale, Plaintiffs read a news article reporting that the Company was sold for $20 million, not $8.85 million as represented.[16] When Plaintiffs confronted the Founders about the article, Plaintiffs learned for the first time that the sale of the Company had been split into "two parts."[17] The first part was in line with Plaintiffs' understanding that New Ventures paid $8.85 million for 75% of the Company. The second part, however, was never disclosed to Plaintiffs and involved New Ventures paying an additional $5.15 million for 436,867 membership interests at $11.79 per unit (more than double the $5.0815 per unit paid in the first part).[18] Specifically, under Section 6.1 of the Purchase Agreement, the parties agreed that:

> As an inducement for the parties to enter into this Agreement and to consummate the transaction contemplated by this Agreement, immediately following the Closing, Purchaser will make an additional capital contribution to the Company of $4,650,000 and together with the previously provided Purchaser Cash Advance in exchange for 436,867 Membership Interests . . . . The price per Membership Interest

---

[15] Compl. ¶¶ 36–37.

[16] Compl. ¶ 13.

[17] Compl. ¶¶ 13–15, 40.

[18] *Id.*

to be used to determine the number of Membership Interests issued to the Purchaser . . . shall be equal to $11.7885 per Membership Interest.[19]

Thus, according to Plaintiffs, Defendants' representations regarding the terms of the Purchase Agreement were knowingly false, and Plaintiffs relied on those representations to their detriment and Defendants' material benefit.[20]

The Complaint comprises three counts: Count One asserts fraud/fraudulent inducement based on misrepresentations in the NCAs against all Defendants; Count Two asserts breach of the NCAs against all Defendants; and Count Three, pursued only by LFI, asserts breach of contract against all Defendants for breaching an oral agreement to allow LFI to transform its Promissory Note into a convertible note or other equity investment in the Company.

The Founders initially filed a partial motion to dismiss Counts One and Three. For its part, Defendant Oars filed a motion for judgment on the pleadings as to all three counts. The Founders later filed a motion to join Oars in its motion for judgment on the pleadings.

---

[19] Purchase Agreement § 6.1. The $4,650,000 referenced in the Purchase Agreement was coupled with a $500,000 Purchaser Cash Advance to reach the $5.15 million consideration allegedly paid in the second part of the Transaction. *See* OAOB at 15.

[20] Compl. ¶ 14. Plaintiffs allege that "the value of the Founders' significant continuing member interest in the Company more than doubled, while the outside investors were bought out at a price below the true market value of the Company." Compl. ¶ 15. They further allege that, "[h]ad [they] known about the additional $5 million being paid by the buyer, [they] never would have approved the sale or relinquished their interests in the Company." Compl. ¶ 2.

## II. ANALYSIS

Under Court of Chancery Rule 12(b)(6), the Court may dismiss a complaint for "failure to state a claim upon which relief can be granted."[21] The standards that govern a motion to dismiss under Rule 12(b)(6) are well settled:

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are well-pleaded if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and (iv) dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible to proof.[22]

In all respects relevant here, the standard for granting a motion for judgment on the pleadings under Court of Chancery Rule 12(c) mirrors the standard implicated by Rule 12(b)(6).[23]

When interpreting a contract for purposes of a motion to dismiss, this court is guided by our Supreme Court's instruction that "[d]ismissal is proper only if the defendants' interpretation is the *only* reasonable construction as a matter of law."[24]

---

[21] Ct. Ch. R. 12(b)(6).

[22] *Largo Legacy Gp. LLC v. Charles*, 2021 WL 2692426, at *8 (Del. Ch. June 30, 2021) (cleaned up) (quoting *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002)).

[23] *See Desert Equities, Inc. v. Morgan Stanley Leverage Equity Fund, II, L.P.*, 624 A.2d 1199, 1205 (Del. 1993).

[24] *Vanderbilt Income & Growth Assocs., L.L.C. v. Arvida/JMB Managers, Inc.*, 691 A.2d 609, 613 (Del. 1996) (emphasis in original); *see also EMSI Acq., Inc. v. Contrarian Funds, LLC*, 2017 WL 1732369, at *11 (Del. Ch. May 3, 2017) ("Dismissal, pursuant to Rule 12(b)(6) is proper only if the defendants' interpretation is the only reasonable

## A. Count One (Fraud)

In Count One, Plaintiffs allege Defendants made fraudulent misrepresentations to Plaintiffs in the NCAs and that Plaintiffs relied on the representations to their detriment when waiving their blocking rights.[25] To state a viable claim for fraud under Delaware law, the plaintiff must well-plead:

> (i) a false representation, usually one of fact, made by a defendant; (ii) defendant kn[ew] or believe[d] the representation was false, or ma[de] it with reckless indifference to the truth; (iii) an intent to induce the plaintiff to act or refrain from acting; (iv) the plaintiff act[ed] or refrain[ed] from acting in justifiable reliance on the representation; and (v) damage resulting from such reliance.[26]

The main thrust of Defendants' argument is that the fraud claim fails because Plaintiffs fail to identify a knowingly false representation. As explained below, I disagree.

### 1. Plaintiffs' Interpretation of the NCAs Is Reasonable

Front and center in both the fraud claim and breach of contract claim in Count Two are the representations contained in Sections 4(b) and (c) of the NCAs. They read in full as follows:

---

construction as a matter of law.") (citing *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 615 (Del. 2003)).

[25] Compl. ¶¶ 45–46, 50.

[26] *Infomedia Gp., Inc. v. Orange Health Sols., Inc.*, 2020 WL 4384087, at *3 (Del. Super. Ct. July 31, 2020) (citing *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983)).

9

(b) No Seller will receive more than $5.0815 per each Company membership interest the Seller is transferring at Closing.

(c) Except with respect to the purchase price for the Company membership interests Sellers are transferring at Closing, none of the Sellers will receive any other cash payments or other valuable inducements in connection with the Closing with respect to such membership interests, including any right to receive delayed payments or escrowed amounts deposited at the time of the Closing. For the avoidance of doubt, this representation does not relate to any employment contracts, consulting contracts or benefits plans relating to services any of the Sellers may provide after the Closing nor does it relate to ordinary salaries, bonuses, or the future sale of membership interests any of the Sellers retain after the Closing.[27]

Put simply, Defendants argue that these representations are true. All sellers, they say, including Plaintiffs and the Founders, received the same price for the membership units sold—$5.0815. This is undisputed.[28] Thus, as represented, Defendants did not "receive any other cash payments or other valuable inducements in connection with the Closing *with respect to such membership interests*."[29] Moreover, the NCAs clarified that "this representation does not relate to . . . the future sale of membership interest any of the Sellers retain after Closing."[30]

---

[27] NCAs § 4(b)–(c).

[28] Tr. of Oral Arg. on Defs. Swati (Mia) Saini Duchnowski and Laura Lisowski Cox's Partial Mot. to Dismiss and Def. Oars + Alps LLC's Mot. for J. on the Pleadings ("Oral Arg. Tr.") at 70:8–16.

[29] NCAs § 4(c) (emphasis added).

[30] *Id.*

10

The additional $5.15 million from New Ventures, from Defendants' perspective, was consideration for a separate transaction that falls outside of the representations in Sections 4(b) and (c) because it involved the "future sale of membership interests."[31]

While Defendants' interpretation of the NCAs is reasonable, it is not the only reasonable interpretation, especially given the context in which the representations at issue were made. The high level of confidentiality requested by New Ventures prohibited Plaintiffs from ever reviewing the Purchase Agreement before having to decide how to proceed with their interests in the Company, including whether to waive important blocking rights.[32] This dynamic prompted Plaintiffs and Defendants to enter into the NCAs, which in turn reflected that Plaintiffs were forced to rely exclusively upon the "accuracy and good faith representations of the

---

[31] *Id.*

[32] *See* NCAs § B ("Because of the confidentiality obligations imposed on the Company by the Purchaser, the Holder and its representative have not had the opportunity to review the Purchase Agreement . . . [I]n entering into this Agreement, the Holder is relying on the accuracy and good faith of the representations of the Founders and the Company as to the terms of the Purchase Agreement and related documents); NCAs § E ("Pursuant to the Holder's Note Purchase Agreement, the Sellers may not transfer the membership interests in the Company contemplated by the Purchase Agreement without the consent of the Holder while the Holder's Note remains outstanding."); *see also* Compl. ¶¶ 32–34.

11

[F]ounders and the Company as to the terms of the Purchase Agreement and related documents."[33]

When subsequent information revealed that the Purchase Agreement also required New Ventures to invest an additional $5.15 million into the Company, Plaintiffs maintained that this payment was a "valuable inducement" to the Founders, as that term appears in Section 4(c) of the NCAs, to enter into the Purchase Agreement. Although each member ostensibly received the same price per membership interest sold, it is reasonably conceivable that the second part of the Transaction actually reflects additional value for the Founders that was not shared with other members, including Plaintiffs.[34] Indeed, Plaintiffs allege that New Ventures' offer, as reflected in the first part of the Transaction, actually represented "a lower value than other potential investors placed on the Company," yet Defendants elected to accept the offer nevertheless.[35] It is reasonable to infer from this fact that New Ventures' further investment in the Company, and the value that investment created for the Founders' retained membership units, induced Defendants to accept a lower offer from New Ventures with respect to the units sold in the first part of the Transaction.

---

[33] NCAs § B.

[34] Compl. ¶ 38.

[35] Compl. ¶ 30.

In this regard, Defendants argue that New Ventures' additional investment in the Company, as a matter of undisputed fact and contract, does not change the amount paid "with respect to such membership interests" that were sold as part of the Transaction.[36] I disagree that this is the only reasonable inference to be drawn from the Complaint. Just because Defendants did not receive any additional funds "with respect to such membership interests" does not mean that Defendants did not receive "an inducement" that motivated them to agree to sell their membership interests in the Transaction.[37] Again, the very language of the Purchase Agreement described the additional contribution as "an inducement for the parties to enter into this Agreement and to consummate the transaction."[38] That the inducement may have related to the *retained shares* does not mean it did not also relate to the *sold shares*.

Defendants' argument that the investment occurred post-closing and thus falls within the representation's carve-out of "future sale[s] of membership interests" also fails, at least for now. Whether New Ventures' investment occurred simultaneous with the closing or post-closing is vigorously disputed by the parties[39] and, more

---

[36] NCAs § 4(c); OAOB at 27.

[37] *See* NCAs § 4(c).

[38] Purchase Agreement § 6.1.

[39] *Compare* OAOB at 15 (referring to the $5.15 million payment as a "Post-Closing Cash Investment") *with* Pls.' Combined Br. in Opp'n to Defs.' Dispositive Mots. ("PB")

13

importantly, the timing of the alleged "parts" of the Transaction is inconsistently described within the Purchase Agreement itself.[40]   Given these conflicting provisions, I cannot say as a matter of pleading or as a matter of law that the Purchase Agreement unambiguously provides that the post-closing investment was a future sale of membership interests such that the second part of the Transaction falls outside of the representations in the NCAs.

### 2. Plaintiffs Have Well-Pled the Other Elements of Fraud

Defendants also argue that Plaintiffs have not adequately pled the other *prima facie* elements of fraud under Delaware law.  But, as Plaintiffs point out, and as the court made clear in *Prairie Capital III LP v. Double E Holding Corp.*, "[w]hen a party sues based on a written representation in a contract, . . . satisfying the

---

(D.I. 30) at 3–5 (stating the $5.15 million payment was made in connection with the transaction, rather than post-closing).

[40] *Compare* Purchase Agreement § 2 ("All proceedings to be taken and all documents to be executed and delivered by all parties hereto at the closing . . . will be taken and executed *simultaneously*, and no proceedings will be deemed taken nor will any documents be deemed executed or delivered until all take place, are executed and are delivered.") (emphasis added) *with* Purchase Agreement § 6.1 ("[I]mmediately *following the Closing*, Purchaser will make an additional capital contribution to the Company of $4,650,000 . . . .") (emphasis added).  As Plaintiffs point out, the Purchase Agreement required as a deliverable for Closing the execution of the subscription agreement and a restated LLC agreement, which allows a reasonable inference that, at Closing, New Ventures had already acquired the additional interests.  PB at 15 (referring to Purchase Agreement §§ 2.3(a)(ii), (x), 2.3(b)(ii), (iii)).

14

remaining elements [of fraud] at the pleading stage is relatively straightforward."[41]

That observation holds true here.

First, as discussed above, Plaintiffs well-plead that Defendants made false representations in the NCAs. Second, Plaintiffs allege that Defendants knowingly made that misrepresentation and, unlike the other elements of fraud, knowledge may be averred generally.[42] Third, Plaintiffs allege that "Defendants made the misrepresentations to induce Plaintiffs into entering into the Note Cancellation Agreement,"[43] and, as the *Prairie Capital* court noted, "[i]t is reasonably inferable that the defendants intended to induce reliance on the representations because they appeared in a written agreement."[44] Fourth, Plaintiffs well-plead that they acted in justifiable reliance on the representation by entering into the Purchase Agreement and voluntarily surrendering their contractual right to block the Transaction.[45] And

---

[41] *Prairie Cap. III LP v. Double E Hldg. Corp.*, 132 A.3d 35, 62 (Del. Ch. 2015); *see id.* ("It is reasonably inferable that the defendants intended to induce reliance on the representations because they appeared in a written agreement. For the same reason, it is reasonably inferable that the plaintiff relied on the representations when entering into the agreement. The plaintiff can claim causally related harm because it entered into an agreement it otherwise would not have signed.").

[42] Ct. Ch. R. 9(b); *see* Compl. ¶ 45 ("At the time they made these representations, Defendants knew the representations were false.").

[43] Compl. ¶ 46.

[44] *Prairie Cap. III LP*, 132 A.3d at 62.

[45] Compl. ¶ 49.

15

finally, Plaintiffs well-plead they were damaged by giving up their valuable interests in Oars and their blocking rights to the Transaction "without appropriate compensation."[46]

Defendants argue Plaintiffs have not adequately alleged that Defendants knew their contractual representations were false, but again, knowledge may be averred generally and Plaintiffs "need only allege facts sufficient to support a reasonable inference that the representations were knowingly false."[47] According to Plaintiffs, Defendants knowingly executed a Purchase Agreement explicitly stating they were receiving a self-described inducement to enter into the Transaction while, at the same time, they represented to Plaintiffs that no such inducement was made.[48] That is enough to well plead knowledge under Chancery Rule 9.

Defendants also argue that Plaintiffs fail to plead justifiable reliance or damages because the convertible notes would have matured soon after the Transaction, and Plaintiffs would have received less on the matured notes than they

---

[46] Compl. ¶ 50.

[47] *Prairie Cap. III LP*, 132 A.3d at 62; *see also Valley Joist BD Hldgs., LLC v. EBSCO Indus., Inc.*, — A.3d —, 2021 WL 6012466, at *3 (Del. Dec. 20, 2021) (emphasizing that knowledge of the falsity of a representation may be "averred generally" and that the plaintiff need only well plead "facts from which it can reasonably be inferred" that the falsity "was knowable and that the defendant was in a position to know it").

[48] Compl. ¶¶ 2, 35, 38.

received in the Transaction.[49] But, as Plaintiffs point out, rather than hold their notes to maturity, they could have converted their notes into membership interests in Oars so that they could participate in any future sale of the Company, presumably at a higher value.[50] That, for now, is enough to survive dismissal.

With that said, I agree with Defendants that, to the extent Plaintiffs' claim for fraud is based on the Promissory Note payoff letter, it must fail. As explained below, Plaintiffs' claim that the Promissory Note carried conversion rights is not well-pled. And, by its express terms, the Promissory Note permitted the Company to prepay the note at any time before the maturity date, which is exactly what occurred, as confirmed in the payoff letter.[51] Thus, because Plaintiffs received all they were contractually due, Plaintiffs cannot satisfy the elements of damages or reliance with respect to this aspect of their fraud claim. Additionally, as Defendants note,

---

[49] OAOB at 21–22, 29–30.

[50] Oars argues in its Reply Brief that because this point is not pled in the Complaint, Plaintiff cannot argue the point now. *See* Def. Oars + Alps LLC's Reply Br. in Further Supp. of its Mot. for J. on the Pleadings (D.I. 34) at 13. But Plaintiffs make their observations regarding the note conversion option directly in response to Oars's argument that blocking the Transaction and *doing nothing else* would result in maturation of the notes and less value to Plaintiffs. Therefore, in my view, the responsive argument is not an attempt to amend a pleading but, instead, is simply an observation that Defendants' perspective regarding maturation of the notes is not the only reasonable inference to be drawn from what has already been pled.

[51] Promissory Note § 3 ("Maker [defined as Oars & Alps LLC] shall have the right, at any tie, to prepay this Note . . . ."); OAOB Ex. 3 ("Payoff Letter").

17

Plaintiffs did not respond to this argument in their brief and have, therefore, conceded it.[52]

### 3. The "Anti-Bootstrapping Rule"

Defendants also argue that Plaintiffs' fraud claim is actually an improperly "bootstrapped" breach of contract claim and, therefore, must be dismissed under the so-called "anti-bootstrapping rule."[53] Of course, the parties have proffered very different constructions of the anti-bootstrapping rule, which suggests the "rule" has not yet evolved as such. Defendants see the anti-bootstrapping rule as a statement of the general proscription under Delaware law that prohibits a plaintiff from pleading "fraud and breach of contract claims [] contemporaneously," and maintain that an exception to this general rule only applies where the fraud claim is premised on conduct 'separate and distinct' from the conduct underlying the alleged breach of contract"[54] or on "a violation of an independent duty imposed by law."[55] In response,

---

[52] *See, e.g.*, *Emerald P'rs v. Berlin*, 2003 WL 21003437, at *43 (Del. Ch. Apr. 28, 2003) ("It is settled Delaware law that a party waives an argument by not including it in its brief."), *aff'd*, 840 A.2d 641 (Del. 2003) (TABLE).

[53] OAOB at 33–34; Founders' OB at 8–11.

[54] Founders' OB at 1; *see also id.* at 10 (quoting *Furnari v. Wallpang*, 2014 WL 1678419, at *8 (Del. Super. Ct. Apr. 16, 2014)).

[55] *Id.* at 9 (citing *ITW Glob. Invs. Inc. v. Am. Indus. P'rs Cap. Fund IV, L.P.*¸ 2015 WL 3970908, at *6 (Del. Super. Ct. June 24, 2015) (quoting *Midland Red Oat Realty, Inc. v. Freidman, Billings & Ramsey & Co.*, 2005 WL 445710, at *3 (Del. Super. Ct. Feb. 23, 2005))).

Plaintiffs argue that the anti-bootstrapping rule is itself an exception that should be applied to bar a fraud claim only when a plaintiff seeks to convert a clear breach of contract claim into a fraud claim by adding vague allegations of fraudulent inducement or allegations that the defendant never intended to perform.[56] At oral argument, counsel for all parties observed that Delaware caselaw on the anti-bootstrapping doctrine is "a little bit muddled" and "all over the place."[57] Even a cursory review of the substantial Delaware jurisprudence on this subject reveals that "a little bit muddled" may understate the point.

For their part, Defendants point to authority where courts appear to hold that a plaintiff can avoid the anti-bootstrapping rule only by alleging conduct giving rise to the fraud that is separate and distinct from the conduct giving rise to the breach of contract or that reflects a violation of an independent legal duty (separate from the contract).[58] This conception of *prima facie* fraud, in my view, is too limiting. To be sure, a plaintiff can avoid the anti-bootstrapping rule by pleading facts in support of

---

[56] PB at 20 (citing *Swipe Acq. Corp. v. Krauss*, 2020 WL 5015863, at *11 (Del. Ch. Aug. 25, 2020)) ("A contracting party may not 'bootstrap' a breach of contract claim into a fraud claim merely by adding the words 'fraudulently induced' or alleging that the contracting parties never intended to perform.") (internal quotation marks omitted).

[57] Oral Arg. Tr. at 75:13–15 (counsel noting that "everyone seems to concede that some of the case law is a little bit muddled in some of the verbiage that they use"); *id.* at 33:13–15 (counsel stating that "the bootstrapping cases are a little bit all over the place on this").

[58] Founders Br. at 8–11 (collecting cases).

19

a fraud claim that have nothing to do with the facts pled in support of a separately alleged breach of contract. That proposition, I think, is self-evident. But a plaintiff can also plead a fraud claim that is not the product of improper bootstrapping by alleging facts that support an inference that the defendant knowingly made false representations in a contract on which the plaintiff justifiably relied, and then breached that contract by violating the representation(s) that were falsely made. That scenario, if well pled, supports at least two viable claims—fraud *and* breach of contract.[59]

In my view, the anti-bootstrapping rule bars a fraud claim where the plaintiff merely "adds the term 'fraudulently induced' to a complaint or alleges that the defendant never intended to comply with the agreement at issue at the time the parties entered into it," but it does not prevent a fraud claim against defendants who "knew [contractual representations] were false, and yet made them anyway."[60]

---

[59] *See* PB at 20–21 (discussing *Anschutz Corp. v. Brown Robin Cap., LLC*, 2020 WL 3096744, at *11 (Del. Ch. June 11, 2020); *Narrowstep, Inc. v. Onstream Media Corp.*, 2020 WL 5422405 (Del. Ch. Dec. 22, 2010); *Osram Sylvania Inc. v. Townsend Ventures, LLC*, 2013 WL 6199554 (Del. Ch. Nov. 19, 2013); and *ITW Glob. Invs. Inc. v. Am. Indus. P'rs Cap. Fund IV, L.P.*, 2015 WL 3970908 (Del. Super. June 24, 2015)).

[60] *Anschutz*, 2020 WL 3096744, at *15; *see also Swipe Acq. Corp.*, 2020 WL 5015863, at *11 ("A contracting party may not 'bootstrap' a breach of contract claim into a fraud claim merely by adding the words 'fraudulently induced' or alleging that the contracting parties never intended to perform.") (internal quotation marks omitted); *In re Bracket Hldg. Corp. Litig.*, 2017 WL 3283169, at *8 (Del. Super. Ct. July 31, 2017) (same); *3M Co. v. Neology, Inc.*, 2019 WL 2714832, at *13–14 (Del. Super. Ct. June 28, 2019) (same).

A rule that would limit a plaintiff's recovery for so-called "contractual fraud" solely on the ground that the same conduct also constitutes a breach of contract would offend Delaware public policy and the now-settled Delaware law regarding "contractual fraud" that is animated, in part, by those policy concerns.[61]

Thus, the anti-bootstrapping rule does not prevent parties from bringing a fraud claim if (1) the plaintiff alleges the seller knowingly made false contractual representations,[62] (2) "damages for plaintiff's fraud claim may be different from plaintiff's breach of contract claim,"[63] (3) "the conduct occurs prior to the execution of the contract 'and thus with the goal of inducing the plaintiff's signature and willingness to close on the transaction,'"[64] or (4) "the breach of contract claim is not well-pled such that there is no breach claim on which to 'bootstrap' the fraud

---

[61] *E.g.*, *Abry P'rs V, L.P. v. F & W Acq. LLC*, 891 A.2d 1032, 1064 (Del. Ch. 2006) (preserving, under the "public policy of this State," a party's ability to bring a fraud claim despite contractual prohibitions when "the Seller knew that the . . . contractual representations and warranties were false").

[62] *See Pilot Air Freight, LLC v. Manna Freight Sys., Inc.*, 2020 WL 5588671, at *26 (Del. Ch. Sept. 18, 2020); *Swipe Acq.*, 2020 WL 5015863, at *11; *Anschutz*, 2020 WL 3096744, at *15.

[63] *Pilot Air Freight*, 2020 WL 5588671, at *26 (quoting *Swipe Acq.*, 2020 WL 5015863, at *11).

[64] *Id.* (quoting *In re Bracket Hldg. Corp. Litig.*, 2017 WL 3283169, at *8–9 (Del. Super. Ct. July 31, 2017)).

claim."[65] The facts as pled here certainly fall into the first category and likely also the second.

In this case, while Defendants are correct in noting the significant overlap between Counts One and Two,[66] the essence of Count One is the allegation that Defendants knowingly made false contractual representations in the NCAs.[67] Even the cases cited by Defendants explain that a plaintiff who well-pleads that a defendant made a knowingly false contractual representation for the purpose of inducing reliance has pled an act separate and distinct from the breach of contract and, in doing so, has avoided the anti-bootstrapping rule.[68]

Additionally, as noted, fraud claims that assert damages that are distinct from breach damages are not duplicative under the anti-bootstrapping rule. In this case, Plaintiffs seek compensatory or rescissory damages for the monetary losses caused

---

[65] *Id.*

[66] *Compare* Compl. ¶¶ 44, 46, 49 *with* Compl. ¶¶ 53, 59.

[67] Compl. ¶ 45; *see Swipe Acq.*, 2020 WL 5015863, at *1; *Anschutz*, 2020 WL 3096744, at *11.

[68] *See Furnari v. Wallpang, Inc.*, 2014 WL 1678419, at *8 (Del. Super. Ct. Apr. 16, 2014) (describing "falsely impl[ying] an existing fact" to be the type of separate action the anti-bootstrapping rule allows); *Anschutz*, 2020 WL 3096744, at *15 ("[T]o hold that Buyer can recover only capped damages for knowingly false contractual representations would be to countenance and immunize fraud.") (citing *Abry P'rs*, 891 A.2d at 1064); *see also Pilot Air Freight*, 2020 WL 5588671, at *26 (same).

by the alleged fraud,[69] but seek only compensatory damages for the alleged breach of contract.[70] At this stage, I am satisfied that the remedies as pled are sufficiently distinct to avoid a pleading stage inference of bootstrapping.[71]

## B. Count Two (Breach of Contract)

As with Count One, Count Two hinges on the truthfulness of the representations in the NCAs. The elements of a breach of contract are, "(1) the existence of a contractual obligation, (2) a breach of that obligation, and (3) damages as a result."[72] If the representations were true, there can be no breach.[73]

Defendants maintain the NCAs are unambiguous and that the representations made were indisputably accurate. Thus, they say, there is no well-pled breach of contract as a matter of law.

---

[69] Compl. ¶ 18(e).

[70] Compl. ¶ 56(b).

[71] *See* Compl. ¶¶ 39, 41; *Kainos Evolve, Inc. v. InTouch Techs., Inc.*, 2019 WL 7373796, at *3 (Del. Ch. Dec. 31, 2019) (declining to apply the anti-bootstrapping rule in part because "it is quite possible that the measure of damages for the fraud claim would be different" and thus dismissal "would be premature"); *Firmenich Inc. v. Nat. Flavors, Inc.*, 2020 WL 1816191, at *10 (Del. Super. Ct. Apr. 7, 2020) (denying motion to dismiss a fraud claim by holding that "rescissory damages sufficiently distinguishes the breach of contract claim from the fraudulent inducement claim"), *reargument denied*, 2020 WL 2193285 (Del. Super. Ct. May 6, 2020), *and appeal refused*, 230 A.3d 901 (Del. 2020).

[72] *Deluxe Ent. Servs. v. DLX Acq. Corp.*, 2021 WL 1169905, at *3 (Del. Ch. Mar. 29, 2021).

[73] *See, e.g.*, *Encore Energy P'rs*, 72 A.3d at 106 (affirming dismissal of a breach of contract claim when the complaint failed to allege facts demonstrating a breach).

I cannot dismiss Count Two for the same reasons I cannot dismiss Count One: While it is true that judgment on the pleadings and dismissal may be proper when a contract is unambiguous and the movant offers the only reasonable interpretation,[74] as explained above, Plaintiffs have offered a competing construction of the representations at issue that is also reasonable. Accordingly, Defendants' motions must be denied as to Count Two.

## C. Count Three (Breach of Contract)

Count Three, brought solely by LFI, asserts breach of an alleged oral contract, in which the parties agreed to transform the Promissory Note into a convertible note on terms previously agreed to by the parties in convertible notes issued to LFI in connection with its earlier investments.[75] LFI alleges that Defendants breached this agreement by refusing to substitute the Promissory Note with convertible notes. This breach, it is alleged, caused harm to LFI when the Company was sold and LFI was not compensated as if the Promissory Note carried conversion rights.[76] As explained below, Count Three must be dismissed for several reasons.

*First*, Count Three rests on an alleged oral agreement that is prohibited by the parol evidence rule and the express terms of the Promissory Note itself. Parties are

---

[74] *See Deluxe Ent. Servs.*, 2021 WL 1169905, at *2.

[75] Compl. ¶¶ 7, 28, 59.

[76] Compl. ¶¶ 58–62.

barred from admitting extrinsic evidence when a contract is unambiguous and fully integrated.[77] The Promissory Note is unambiguous and contains an integration clause and an anti-modification clause, the latter of which states that the Promissory Note can only be amended "by an agreement in writing" signed by both parties.[78] For its part, the integration clause explicitly states that "[t]his Note *sets forth the entire agreement and understanding*" and "that *no oral or other agreements, understandings,* representations or warranties exist with respect to this Note."[79] These provisions are unambiguous and serve the very purpose of preventing claims that prior written or any oral agreements modify the rights and obligations set forth

---

[77] *See Phillips v. Wilks, Lukoff & Bracegirdle, LLC*, 2014 WL 4930693, at *3 (Del. Oct. 1, 2014) (TABLE); *J&B Steel Contractors., Inc. v. C. Iber & Sons, Inc.*, 642 N.E.2d 1215, 1217 (Ill. 1994) ("[T]he parol evidence rule . . . generally precludes evidence of understandings, not reflected in a writing, reached before or at the time of its execution which would vary or modify its terms."); *Air Safety, Inc. v. Teachers Realty Corp.*, 706 N.E.2d 882, 884 (Ill. 1999) ("If the language of the contract is facially unambiguous, then the contract is interpreted by the trial court as a matter of law without the use of parol evidence."). In the briefing, Oars cites to Illinois law regarding Count Three, while the other parties cite only to Delaware law. It appears Illinois law governs the interpretation of the Promissory Note. Promissory Note § 8 ("The terms of this Note shall be governed by and construed under the laws of the State of Illinois."). At the end of the day, however, choice of law matters little since Illinois and Delaware law are aligned on the operative contract construction issues. *See Deuley v. Dyncorp Int'l, Inc.*, 8 A.3d 1156, 1161 (Del. 2010) (explaining that a "false conflict" arises for choice of law purposes when the laws of the competing jurisdictions are aligned).

[78] Promissory Note § 9.

[79] Promissory Note § 10 (emphasis added).

in the Promissory Note.[80]  And, as LFI acknowledges, the Promissory Note itself provides no right of conversion.[81]

In its effort to avoid the clear terms of the Promissory Note, LFI argues that the agreement it seeks to enforce is not connected to the Promissory Note but is, instead, an entirely separate oral agreement that sets forth independent rights and obligations.[82]  In other words, the integration and merger clauses in the Promissory Note only address the completeness of that contract and do not suggest that the provisions of that contract express the entirety of the agreement or understanding between the parties with respect to LFI's $500,000 investment.  I disagree.

*First*, LFI's argument is flatly inconsistent with the constricting language of the Promissory Note.  The only reasonable interpretation of those provisions is that they bar the oral agreement argument Plaintiffs assert exists here and convey the

---

[80] *See Addy v. Piedmonte*, 2009 WL 707641, at *9 (Del. Ch. Mar. 18, 2009) ("The applicability of the parol evidence rule also may be triggered by an integration clause in the contract.  Clauses indicating that the contract is an expression of the parties' final intentions generally create a presumption of integration."); *Thompson v. Gordon*, 948 N.E.2d 39, 47 (Ill. 2011) ("The basic rules of contract interpretation are well settled. In construing a contract, the primary objective is to give effect to the intention of the parties. A court will first look to the language of the contract itself to determine the parties' intent."); Restatement (Second) of Contracts § 213 cmt. a (1981) ("[The parol evidence rule] renders inoperative prior written agreements as well as prior oral agreements.").

[81] *See generally* Promissory Note.

[82] PB at 22–23; *see also* Oral Arg. Tr. 80:7–9 (Plaintiffs' counsel arguing the oral agreement at issue in Count Three existed independently and "was entered into [] before the note was signed and was then affirmed after the note was signed"); Compl. ¶¶ 7, 24, 28.

26

intent that the Promissory Note was and would be the "entire agreement and understanding" between the parties, and "that no oral or other agreements, understandings, representations or warranties exist" with respect to the Promissory Note or anything related to it.[83]  A natural reading of these provisions reveals that, absent a written modification, there is and can be no agreement—oral or otherwise—pertaining to LFI's $500,000 investment other than the Promissory Note.[84]

---

[83] Promissory Note § 10.  Plaintiffs make much ado about the lack of a "superseding clause" in the Promissory Note because such a clause is present in the Note Purchase Agreements, but this discrepancy is easily explained when one considers the nature of each contract. *See* Compl. Ex. A (Note Purchase Agreement) ("This Agreement and the other Transaction Documents constitute the entire agreement between the parties with regard to the subject matter hereof and thereof, *superseding all prior agreements or understandings*, whether written or oral, between the parties.") (emphasis added).  A purchase agreement is often the product of several iterations, memoranda of understandings and other agreements, before the final version is agreed upon by the parties.  *See, e.g.*, *West Willow-Bay Ct., LLC v. Robino-Bay Ct. Plaza, LLC*, 2009 WL 3247992, at *2 (describing "a memorandum of understanding that would lead to an amendment of the Purchase Agreement").  A self-described "simple" promissory note, by contrast, likely would not be preceded by a memorandum of understanding or another preliminary "agreement to agree."  Compl. ¶ 7.  Moreover, the *lack* of a provision has little interpretive value in this case, where other provisions handily prohibit the claim at issue.  *See, e.g.*, *Comrie v. Enterasys Networks, Inc.*, 2004 WL 293337, at *4 n.34 (Del. Ch. Feb. 17, 2004) (noting that, given the facts in that case, "[w]hile [a certain] provision would evidence an intent, lack of such a provision does not suggest lack of such intent").

[84] *See Addy*, 2009 WL 707641, at *9 ("[I]n determining whether a contract is fully integrated, the court focuses on whether it is carefully and formally drafted, whether it addresses the questions that *would naturally arise out of the subject matter*, and whether it expresses the final intentions of the parties.") (emphasis added); *Foxfield Realty, Inc. v. Kabala*, 678 N.E.2d 1060, 1063 (Ill. App. Ct. 1997) (observing that courts prefer an interpretation of agreements that makes them "fair, customary, and *such as prudent persons would naturally execute*," rather than "inequitable, unusual, or such as reasonable persons would not be likely to enter into") (emphasis added).

27

*Second*, even if extrinsic evidence were to be considered, it would not support LFI's position. LFI pleads that the Promissory Note was made with the intention eventually to replace it with a convertible note.[85] But LFI is a sophisticated investor, and sophisticated investors are expected to negotiate for an agreement that protects their interests and reflects their intentions,[86] rather than accept a contract with terms that directly conflict with the alleged understanding they have reached.[87]

LFI asserts the parties chose to structure the investment as a promissory note because of an emergency need for capital.[88] But this does not explain away the restrictive provisions in the Promissory Note, particularly given that the parties already had a convertible note template in place.[89] LFI knew what a convertible note

---

[85] Compl. ¶ 7.

[86] *See Unisuper Ltd. v. News Corp.*, 2005 WL 3529317, at n.39 (Del. Ch. Dec. 20, 2005) (noting that the plaintiffs "are sophisticated investors capable of negotiating enforceable agreements to protect their interests"); *Downs v. Rosenthal Collins Gp., L.L.C.*, 963 N.E.2d 282, 296 (Ill. App. Ct. 2011) (noting that the plaintiff, a "sophisticated business person," "could have contracted for . . . terms to protect himself" and observing that "sophisticated parties are capable of bargaining for explicit contract terms").

[87] *See* Promissory Note §§ 9–10.

[88] Compl. ¶¶ 7, 28.

[89] Compl. Ex. B; *see Wheeler Fin., Inc. v. L. Bulletin Publ'g Co.*, 129 N.E.3d 53, 65 (Ill. App. Ct. 2018) ("A course of dealing is a sequence of previous conduct between the parties to an agreement which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct.") (citing Restatement (Second) of Contracts § 223 (1981)); *R.O.W. Window Co. v. Allmetal, Inc.*, 856 N.E.2d 55, 60 (Ill. App. Ct. 2006) ("A course of dealing between parties gives particular meaning to and supplements or qualifies the terms of the agreement.").

was and how to draft one. That it chose instead to enter into a contract that reflected a pure debt arrangement speaks volumes about the understanding of the respective parties.

Moreover, in the sale of its interests, LFI accepted a payoff of principal and interest without so much as a hint of conversion rights in the Note Payoff Agreement.[90] The Complaint alleges LFI "objected" to this before eventually consenting,[91] but considering Plaintiffs held powerful blocking rights, the only reasonable inference is that if the parties had agreed conversion rights existed in the Promissory Note, LFI would have put up more of a fight to exercise those rights as it was being bought out.[92]

For these reasons, I am satisfied the parol evidence rule and the express terms of the Promissory Note defeat Count Three, but regardless, the behavior between

---

[90] Payoff Letter ("[A]ll obligations of the Company to the Noteholder under the Note shall be satisfied in full and the Company shall have no further obligations to the Noteholder under the Note."). This court has stated that, in considering extrinsic evidence, "the parties' course of performance [i]s the most persuasive evidence of the meaning of the parties agreement." *In re Mobilactive Media, LLC*, 2013 WL 297950, at *16 (Del. Ch. Jan. 25, 2013) (cleaned up); *see also Personal Fin. Co. v. Meredith*, 350 N.E.2d 781, 789 (Ill. App. Ct. 1976) (noting that "course of dealing, usage of trade or course of performance are also relevant to the inquiry of the parties' bargain in fact").

[91] Compl. ¶ 9.

[92] *See* Compl. ¶ 4; *see also Encore Energy P'rs*, 72 A.3d at 100 (observing that, in considering a motion to dismiss, Delaware courts do not "draw unreasonable references in the plaintiff's favor").

29

LFI and Defendants, as alleged, does not support a reasonable inference that the Promissory Note was anything other than what it was—a debt instrument with no equity conversion rights. Count Three must be dismissed.

## III. CONCLUSION

Based on the foregoing, Defendants' Motions for Judgment on the Pleadings and to Dismiss Counts One and Two are DENIED. Defendants' Motions for Judgment on the Pleadings and to Dismiss Count Three are GRANTED.

**IT IS SO ORDERED.**